**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DIVISION OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **JANET PRIM and ERIC PRIM,** | )( | **Civil Action No.:4:18-cv-1774** |
| | )( | **(Jury Trial)** |
| *Plaintiffs,* | )( | |
| | )( | |
| **V.** | )( | |
| | )( | |
| **MONTGOMERY COUNTY, TEXAS,** *et al.,* | )( | |
| | )( | |
| *Defendants.* | )( | |

**PLAINTIFFS' RESPONSE TO:**

**MONTGOMERY COUNTY, STEIN, WEBB, AND TERRELL'S
<u>MOTIONS FOR SUMMARY JUDGMENT</u>**

**TO THE HONORABLE LYNN N. HUGHES:**

NOW COME PLAINTIFFS ERIC AND JANET PRIM and file this response to MONTGOMERY COUNTY, STEIN, WEBB, AND TERRELL'S MOTIONS FOR SUMMARY JUDGMENT (hereinafter, sometimes, "County's MSJ") and will show the following (every exhibit referenced is incorporated by reference as if fully set forth herein):

**<u>INTRODUCTION</u>**

Eric Prim, 59, with a B.S. in chemical engineering and MBA, an inventor and business (based upon his inventions) owner with over 2000 employees and his wife Janet Prim, 57, with a B.S. in chemistry, B.S. Environmental Sciences and MBA had never been arrested, or convicted for a crime,[1] in their entire lives. They were arrested for the first time ever, however, after attending a concert near where they lived at the Cynthia Woods Mitchell Pavilion (CWMP) in The Woodlands, Texas. Janet is blind and has for 20 years had multiple sclerosis (MS). Eric acts as her

---

[1] Eric Prim has never even received a traffic citation in his entire life even as he drives most days.

primary caregiver and escorts her, as he has for twenty years, where she needs to go as he was doing the night of June 18, 2017 at the CWMP.

When the Prims arrived at the CWMP, Defendants Lieutenant Felicia Webb observed Janet's unsteady gait, stating *"I knew that she was handicapped."* **Exhibit 4,** Deposition of Webb, p. 69, l. 16-17.

Later that evening, the Prims were brought to the CWMP security office after a security guard, John Harshaw ("Harshaw") forcefully detained the Prims, taking them to the CWMP security office.

The Prims explained to Harshaw as well as the deputies that Janet's movements were due to her Multiple Sclerosis, which causes a lack of coordination and unsteady gait. This was explained to Lieutenant Webb and Deputy Stein yet they arrested to arrest the Prims, charging them with Public Intoxication, which requires that a person be so intoxicated that they are a danger to themselves or others. None of the deputies attempted to run a breathalyzer or blood analysis to determine whether the Prims were actually intoxicated.

Eric and Janet were not intoxicated. Eric displayed no symptoms of intoxication, and Janet's difficulty with coordination, balance, and sight were symptoms of her multiple sclerosis. Plaintiffs explained to the deputies that Janet suffers from multiple sclerosis and described its symptoms, but the deputies chose to arrest Janet and Eric despite being made aware of Janet's disability and its associated symptoms. None of the officers involved attempted to ascertain whether or not the Prims were intoxicated, with the exception of a single attempt at a Horizontal Gaze Nystagmus (HGN) test that was performed on Mr. Prim inconclusively.

The Prims had consumed alcohol that night over a course of over 6 hours but in no way was it enough to make them a danger to themselves or others. See Lance Platt Ph.D.'s[2] intoxication analysis at **Exhibit 10.** There is no indication that the Prims were intoxicated or were a danger to themselves or anyone else. The charges against both of them were subsequently dropped.

While in jail, blind and exhibiting MS symptoms, Janet suffered immensely, saw no doctor, and was terrified of the situation defendants had put her.

Almost a month after filing the police report, once Deputy Stein ("Stein") knowing thew Prim's should not have been arrested was made aware of the Prim's complaint about being wrongfully arrested and then Stein then filed an affidavit that added previously unmentioned elements that did not make it into the police report, such as claims that Eric "had a slight sway", was leaning against a railing, and smelled of alcohol, which are disputed by the Prims and other evidence. **Exhibit 2**, Deposition of Stein, p. 108-118. None of these details were in the initial report filed on the night of the arrests and were instead added a month later by Stein.

Internal review by the Montgomery County Sheriff Department determined that the deputies' behavior in regards to Janet's MS claims and arrest were consistent with the policies ands practices of Defendant Montgomery County, Texas.

---

[2] Platt has experience in law enforcement tactics, training, use of force and policies and procedures. Platt was employed by the College Station, Texas police department for 9 years where he attained the rank of Master officer and Texas certification as Master Peace Officer. Platt was also employed by Texas A&M as a law enforcement trainer and program coordinator. He taught police cadets and certified peace officers in the use of force and defensive tactics as well as developing curriculum on officer safety and tactics. He is a National Highway Traffic Safety Administration (NHTSA) standardized field sobriety testing (SFST) practitioner, instructor and have been designated as a person who "trains the trainers" by the NHTSA. Platt was the Texas coordinator for the Drug Recognition Expert (DRE) program. Platt holds a Bachelor of Science, Master and Ph.D. degrees. Platt was a Texas Peace Officer for over 20 years and was honorably discharged by the State of Texas.

TABLE OF CONTENTS

INTRODUCTION                                                         1

TABLE OF CONTENTS                                                    3

ISSUES                                                               4

OBJECTION TO FACTS ALLEGED BY DEFENDANTS                             4

DEFENDANTS ONLY OFFER INTERESTED WITNESSES                           4

SUMMARY JUDGMENT EVIDENCE                                            5

ADDITIONAL FACTS                                                     6

CAUSES OF ACTION                                                     23

SUMMARY JUDGMENT STANDARDS                                           28

CONCLUSION AND PRAYER                                                30

CERTIFICATE OF SERVICE                                               31

## ISSUES

1.      Whether the defendants are liable for wrongful arrest.

2.      Whether the defendants are liable under the Americans with Disabilities Act.

3.      Whether defendant Montgomery County has a pattern or practice of falsely arresting people.

## OBJECTION TO FACTS ALLEGED BY DEFENDANTS

Plaintiffs object to defendants' recitation of the facts, all by interested or paid witnesses, in their motion for summary judgment insofar as they are in conflict with Plaintiffs' facts asserted herein, declarations, deposition testimony, and other summary judgment evidence provided and

the reasonable inferences in a light most favorable to plaintiff. *Tolan v. Cotton,* 134 S. Ct. 1861 (2104).

## DEFENDANTS ONLY OFFER INTERESTED WITNESSES

The individual defendants themselves, employees of defendant County or co-defendants assert alleged first-hand summary judgment facts. In deciding whether to grant judgment as a matter of law, a "court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, *at least to the extent that that evidence comes from <u>disinterested witnesses</u>.*" *Reeves v. Sanderson Plumbing Prods. Inc.*, 530 U.S. 133, 151 (2000)(emphasis added). Even with the interested witness summary judgment testimony there remains fact issues for trial and, without the interested witnesses, there is only a frivolous motion for summary judgment.

When liability is disputed an officer's account will invariably be favorable to himself and the credibility of that account is crucial. *Gooden v. Howard County, Md.*, 954 F.2d 960, 971 (4th Cir. 1992). Clearly, here summary judgment cannot rest on the statements of interested and paid witnesses--individual defendant officers, County employees and retained experts--that defendants bring forth. "Cases that turn crucially on the credibility of witnesses' testimony in particular should not be resolved on summary judgment." *Abraham v. Raso*, 183 F.3d 279, 287 (3d Cir. 1999).

## LIST OF MOTION FOR SUMMARY JUDGMENT RESPONSE PROOF

Plaintiffs' response relies upon the following summary judgment proof as well as parts of defendants' summary proof:

Exhibit 1:    Deposition of Defendant Harshaw

Exhibit 2:    Deposition of Defendant Richard Stein

Exhibit 3:       Deposition of Defendant Audrey Terrell

Exhibit 4:       Deposition of Defendant Felicia Webb

Exhibit 5:       Deposition of Janet Prim

Exhibit 6:       Deposition of Eric Prim

Exhibit 7:       Deposition of Charles Wayne Tatom

Exhibit 8:       Declaration of Janet Prim

Exhibit 9:       Declaration of Eric Prim

Exhibit 10:      Expert Report of Lance Platt

Exhibit 11:      Video of the Prim's Immediately after arrest in CWMP security office (Doc. 44)

Exhibit 12:      Video of Prims in MCSO squad car to jail (Doc. 44)

Exhibit 13:      Bloomberg biography

Exhibit 14:      CWMP photographs of the Prims in the CWMP security room.

Exhibit 15:      Resume of Lance Platt

## ADDITIONAL FACTS

Eric Prim (Eric), 61, has a B.S. in chemical engineering from the University of Texas and a Masters of Business Administration from Amber University. He is the Chief Operating Officer of Holloman Energy Corporation and President of Pilot Energy Solutions which currently has 2306 employees. A large section of these businesses relies upon his inventions in natural gas recovery from oil and gas field $CO_2$ (carbon dioxide) use. **Exhibit 13**. Eric has never been convicted of any crime in his life. Eric Prim has never received so much as a traffic ticket in his life and the only time he has been detained, arrested, and jailed was by the defendants.

Eric is married to Janet Prim, 59, since 1981. Janet Prim has a B.S in chemistry from the University of Texas, a B.S. in Environmental Sciences, and a Masters of Business Administration

from Amber University. Janet has never been convicted of a crime in her entire life and the only time detained, arrested, and jailed was by the defendants.

Both Eric and Janet Prim were arrested for public intoxication, but charges were dropped.

Defendant Harshaw, who initially interacted with Eric and Janet, only offered commentary on Janet's unsteadiness not Eric's, stating, "I watched them for a while, for a few minutes 'cause they tried to make their way across the mixer aisle, and they were walking back and forth. Ms. Prim was running into the wall[3] and they would stop every ten feet or so and she would sit on the wall or – or – when we got to – once we got to the seating area, she would have to grab on to the back of the seat to hold herself up – every ten-or-so feet, until they got to the sound board." **Exhibit 1**, deposition of John Harshaw p. 16-17, l. 16-2. Harshaw later articulates concern for Janet's ability to walk, stating, "I decided to – Once I watched them walk for so long and run into walls, for the safety of the – them and the safety of other guests at the show, I decided to ask them to stop and get a – you know, get a wheelchair to help her get across." Exhibit 1, deposition of John Harshaw p. 29, l. 2-6. Neither of the Prims ran into anyone as they navigated the crowd. **Exhibit 1**, deposition of John Harshaw p. 31, l. 21-22.

There were no complaints of intoxicated behavior from any guests or employees, including employees in charge of serving alcohol. **Exhibit 1,** deposition of John Harshaw p. 49, l. 19-21. Harshaw made no reports of intoxication when transporting the Prims to the security office. **Exhibit 1**, deposition of John Harshaw p. 52, l. 19-23

When Deputy Stein and Lieutenant Webb were attempting to determine probable cause for a public intoxication arrest, no blood was drawn, and Eric was not given a test to determine intoxication, except for a failed attempt at administering a Horizontal Gaze Nystagmus (HGN) test

---

[3] Janet admits "unsteadiness" but not running into walls. Defendants have produced no medical records that Janet ran into a wall at the CWMP

with inconclusive results. Commenting on it, Deputy Stein testified in deposition that it was noted in his report that the test was inconclusive. **Exhibit 2,** deposition of Richard Stein p. 87, l. 4-8.

In regard to administering tests to determine intoxication, Lieutenant Webb testified in deposition that, "You can ask them if they want to give a blood draw or a Breathalyzer, and they can choose." **Exhibit 4,** deposition of Felicia Webb p. 86 l. 16-23.

When asked if the HGN test determined whether or not the Eric was intoxicated, Lieutenant Webb replied, "No, I do not know." **Exhibit 4,** deposition of Felicia Webb p. 142 l. 10-13.

In reviewing the video of the Prims in the security video of the area where they were initially detained, Lieutenant Webb was asked multiple times whether or not Eric was slurring his words, to which Lieutenant Webb replied in the negative. **Exhibit 4,** deposition of Felicia Webb p. 168 l. 13-16, p. 172 l. 13-19.

Deputy Stein, in describing Eric's behavior, confirmed that neither of the Prims swore, insulted the deputies, or in any way assaulted them. **Exhibit 2**, deposition of Richard Stein p. 144-145, l. 23-13.

Webb testified that the only symptoms of potential intoxication were "I know the smell of alcohol. The glassy eyes." When asked if there were any other symptoms indicating intoxication, Webb testified, "I can't recall at the time." **Exhibit 4,** deposition of Felicia Webb p. 101-102 l. 23-4. Lieutenant Webb then testified that the *smell of alcohol is not an indicator of intoxication*, and that glassy eyes are a symptom that have many causes other than intoxication. **Exhibit 4**, deposition of Felicia Webb p. 102 l. 16-19, p. 103 l. 7-10. "Every person is different. Every person handles alcohol or whatever substance they're on differently. So you have to evaluate a person by how they're acting and their clues" **Exhibit 4,** deposition of Felicia Webb p. 118 l. 5-9. Deputy

Stein also admitted that the smell of alcohol is not an indicator of intoxication. **Exhibit 2,** deposition of Richard Stein p. 82, l. 15-18.

Additional symptoms of intoxication were not mentioned in the police report, though Deputy Stein testified that once an internal affairs investigation was launched, he added in details that were previously omitted from his initial report, such as Eric's posture and the amount of alcohol he alleges Eric consumed. **Exhibit 2**, deposition of Richard Stein p. 110, l. 5-23, p. 118-119. Of course, plaintiffs allege these are known false statements by Stein to claim probable cause which did not exist.

Janet is blind, has multiple sclerosis (MS) and suffered a stroke several years ago. The stroke has affected her brain where she cannot verbalize numbers. **Exhibit 5**, deposition of Janet Prim, p. 17, l. 15; p. 135, l. 4-5; Exhibit 6, deposition of Eric Prim, p. 24, l. 5-15. Janet cannot stand upright due to her MS. **Exhibit 5,** deposition of Janet Prim, p. 23, l. 5-11.

 Janet has sensitivity to bright lights, such as at the CWMP, causing her to be confused and making her very limited eyesight worse. **Exhibit 5,** deposition of Janet Prim, p. 24, l. 1-21.

Blindness is common symptom of MS and make's Janet's vision worse such as when she is having an MS exacerbating episode. **Exhibit 5,** deposition of Janet Prim, p. 22, l. 1-21.

Due to her MS, Janet's left hand and left foot is numb. **Exhibit 5,** deposition of Janet Prim, p. 25, l. 6-16.

Due to her MS, Janet cannot walk in a straight line. **Exhibit 5,** deposition of Janet Prim, p. 18, l. 1-18. Janet has glaucoma in one eye. **Exhibit 5,** deposition of Janet Prim, p. 19, l. 23-24.

There are many types of MS and Janet suffers from "exacerbating-remitting" MS which means the symptoms can worsen at any time. **Exhibit 5**, deposition of Janet Prim, p. 21, l.14-17.

Stress causes Janet's MS symptoms to worsen. **Exhibit 5,** deposition of Janet Prim, p. 27, l. 13-17.

Janet was having exacerbating MS symptoms the night of the CWMP concert. **Exhibit 5,** deposition of Janet Prim, p. 30, l. 1-3.

Janet can recognize her husband Eric by what he is wearing and the way he walks. **Exhibit 5,** deposition of Janet Prim, p. 31, l. 4-13.

Janet's MS causes her to be unbalanced. **Exhibit 5,** deposition of Janet Prim, p. 32, l. 3-12.

Janet needs arm rails to help her walk.  **Exhibit 5**, deposition of Janet Prim, p. 33, l. 11-19.

Janet was suffering an exacerbation (flare-up) when they were leaving the CWMP and met Harshaw. **Exhibit 5,** deposition of Janet Prim, p. 37, l. 2-14.

Janet's symptoms improved from the time she was leaving the concert until she got out of jail. **Exhibit 5**, deposition of Janet Prim, p. 38, l. 19-p.39, l. 13.

Janet is now afraid to leave the house because she is fearful that if she trips when walking the dog, a police officer may arrest her for public intoxication, and she obsesses about her arrest. **Exhibit 5**, deposition of Janet Prim, p. 48, l. 3-14.

Before the concert Janet went to the Grotto for dinner with Eric, Pete and Cindy Kourkoubes and Naomi. Janet drank no alcohol before going to the Grotto. **Exhibit 5,** deposition of Janet Prim, p. 49, l. 14-16; **Exhibit 5,** deposition of Janet Prim, p. 51, l. 17-19.

Janet describes who drank which drinks prior to dinner.  **Exhibit 5,** deposition of Janet Prim, p. 55, l. 13-24.

Before and during dinner Janet drank Chardonnay wine and Janet remembers she drank 3 total glasses of around 5-6 ounces. **Exhibit 5,** deposition of Janet Prim, p. 56, l. 18-p.56, l.3; p.50, l. 1-2.

Eric and Janet were drinking water and wine. **Exhibit 5,** deposition of Janet Prim, p. 59, l. 24-25.

After dinner Eric and Janet walked ten minutes to the CWMP and arrived around 7 pm. **Exhibit 5,** deposition of Janet Prim, p. 59, l. 21-p.60, l.4.

Janet recalls drinking two glasses of wine at the concert. **Exhibit 5,** deposition of Janet Prim, p. 65, l. 19-21. At this time in the deposition Janet believes she drank a total of *5 glasses of wine* from just after 4 pm to around 10 pm.

When Janet left the Pavilion she was stumbling as she always does due to her MS**.  Exhibit 5**, deposition of Janet Prim, p. 70, l. 2-11.

Janet and Eric left the concert area before their other three companions who were still at the concert. **Exhibit 5,** deposition of Janet Prim, p. 71, l. 15-18.

Lieutenant Felicia Webb observed Janet's unsteady gait, stating "I knew that she was handicapped." **Exhibit 4,** Deposition of Webb, p. 69, l. 16-17. Webb elaborated further, stating "I thought maybe she needed a wheelchair," and "I wouldn't even say balance is off. It's just like when she would walk, one leg, you know, maybe from history, some type of paralyzed or whatever." **Exhibit 4**, deposition of Felicia Webb p. 69 l. 4-5, p. 71 l. 13-16.

Lieutenant Webb testified that Medic Charles Tatom made her aware that Janet suffered from MS, but that she did not inquire as to what the symptoms of MS were. **Exhibit 4,** deposition of Felicia Webb p. 80 l. 21-25.

"Webb went on to elaborate on her understanding of Janet's MS, stating "The only thing I recall is that he told me she was okay, like, medically, like injured, no broken bones or anything like that that needed to be treated immediately, and that she had MS. That was about the depth of our conversation." **Exhibit 4,** deposition of Felicia Webb p. 96 l. 5-11.

Right before Janet and Eric met Harshaw neither were intoxicated. **Exhibit 5,** deposition of Janet Prim, p. 72, l. 1-6. Harshaw was event staff security supervisor when he detained the Prims. **Exhibit 1**, deposition of Harshaw, p. 10, l. 9-11. Harshaw brought the Prims to the CWMP security office against their will.

CWMP EMT and medical director Charles Tatom met the Prims after Harshaw forced them to go to rooms at the CWMP. He was contacted by Harshaw to check out the Prims. **Exhibit 7**, deposition of Tatom, p. 13, l. 3-18. Tatom does npt know if Janet Prim was intoxicated. **Exhibit 7,** deposition of Tatom, p. 46, l. 22-p 47, l.2. Tatom remembers Janet saying she had MS and talked to her about it for minutes. **Exhibit 7,** deposition of Tatom, p. 48, l. 7-17.

CWMP medical director **Tatom testifies that Janet was NOT intoxicated to the point she couldn't go home** and she was **"in a position that she could make her own decisions."** Exhibit 7, deposition of Tatom, p. 51, l. 1-9. Tatom testified **"I thought she was perfectly capable of making her own decisions." Exhibit 7**, deposition of Tatom, p. 52, l. 6-8. Tatom testifies he pushed Janet Prim to the police car.  **Exhibit 7**, deposition of Tatom, p. 12, l. 12-15. Tatom testifies Janet's unsteadiness could be related to MS. **Exhibit 7,** deposition of Tatom, p. 67, l. 11-14.

Tatom testifies no one asked for his opinion on MS symptoms nor could he do so due to HIPAA. **Exhibit 7**, deposition of Tatom, p. 74, l. 2-17.

Deputy Stein wrote in his initial report of the incident that Tatom volunteered that Janet slurred her speech and was either unable to answer questions or gave inappropriate answers. This directly contradicts Tatom's sworn testimony further undermines Deputy Steins credibility.

When the Prims arrived at the CWMP, Lieutenant Felicia Webb observed Janet's unsteady gait, stating *"I knew that she was handicapped*." **Exhibit 4,** Deposition of Webb, p. 69, l. 16-17.

MCSO employees Terrell and Webb work a lot of shows at the CWMP. **Exhibit 7,** deposition of Tatom, p. 86, l.18-20.

The standard for public intoxication requires that a person be so intoxicated that they are a danger to themselves or others. In arriving at the decision to arrest and charge the Prims, neither Webb nor Stein conducted breathalyzer tests, analyses of blood alcohol content, or standard field sobriety testing. Webb briefly attempted but did not complete a Horizontal Gaze Nystagmus (HGN) test on Mr. Prim, but did not achieve conclusive results. There is no evidence that Mr. or Mrs. Prim were intoxicated, much less a danger to themselves or others.

Janet and Eric were intending to walk approximately one mile home to their house. Janet felt she would have no problem doing this, stating that the walk is well lit and they had done it four times before. Eric came prepared and had a flashlight. **Exhibit 5**, deposition of Janet Prim, p. 74, l. 2-22.

Janet was open to calling an Uber if they felt they could not walk home. Most people have Uber and Lyft on their phones and could have arranged for a ride even if the Prims had no phone. Eric could have either gave any Uber app possessor cash to cover the small distance to the Prim's residence which is generally $8.00 or less. **Exhibit 5**, deposition of Janet Prim, p. 75, l. 20-23.

No Montgomery County Sheriff's deputy gave the Prim's the opportunity to call anyone. **Exhibit 5**, deposition of Janet Prim, p. 76, l. 2-20.

Under stress due to the MS Janet cannot remember numbers. **Exhibit 5,** deposition of Janet Prim, p. 79, l.16-17.

Janet testifies Eric wanted their lawyer son Robert's[4] phone numbers so if anyone allowed them to phone that he would call their son to come pick them up. **Exhibit 5,** deposition of Janet Prim, p. 78, l. 16-p.79, l.13.

In the jail hallway's Janet lost her balance and hit her head and scratched her shoulder. **Exhibit 5**, deposition of Janet Prim, p. 79, l. 14-21.

When walking in the jail the officers did not assist Janet Prim causing her injuries. **Exhibit 5,** deposition of Janet Prim, p. 80, l. 3-9.

In the deposition Janet is directed to defendants in the deposition by counsel for Montgomery County defendants and she cannot see them. **Exhibit 5,** deposition of Janet Prim, p. 85, l. 13-18.

Prior to the night of their arrest Janet and Eric had walked to the CWMP concerts at least four times with no problems. **Exhibit 5,** deposition of Janet Prim, p. 107, l. 10-18.

Janet was handcuffed at the CWMP. **Exhibit 5,** deposition of Janet Prim, p. 123, l. 25.

Janet's lawyer son Robert had the ability to answer the phone and pick up the Prims from wherever they are. The *MCSO deputy who drove the Prim's to jail looked up Robert Prim's number* and wrote it on Eric's arm. Eric called Robert and he picked up the Prim's from jail. **Exhibit 5,** deposition of Janet Prim, p. 126, l. 1-24.

Montgomery County Sheriff Department determined that there were no violations of policy by the deputies. Lieutenant Webb testified that disciplinary proceedings go through Rand Henderson, the Sheriff-elected to run the Montgomery County Sheriff Department. **Exhibit 4,** deposition of Felicia Webb p. 122 l. 7-13

## DEPOSITION OF ERIC PRIM

---

[4] Robert Prim's phone number, like that of most solo practitioner lawyers, can be found on-line. Often, these are cell phone numbers, and are answered as long as the lawyer is awake.

While being held in handcuffs in the CWMP security office Eric Prim asks the deputies present if they know Montgomery County law enforcement officer Dane Cantwell so he can come get them. **Exhibit 6,** deposition of Eric Prim, p. 13, l. 1-13.

Eric bought his guest alcohol at the Grotto before the concert. **Exhibit 6,** deposition of Eric Prim, p. 20, l. 10-22.

The criminal case against the Prims ended in their favor with no convictions nor requirements of any kind. **Exhibit 6,** deposition of Eric Prim, p. 17, l. 7-15.

Eric did not do the horizontal gaze nystagmus test correctly with Deputy Stein and it was incomplete. **Exhibit 6,** deposition of Eric Prim, p. 22, l. 1-p. 23, l. 3.

Eric asked to take a breathalyzer test but Deputy Stein refused. **Exhibit 6,** deposition of Eric Prim, p. 23, l. 4-7.

Eric testifies as to Janet's many MS and stroke symptoms including unsteady gait, difficulty remembering numbers, mental confusion, vision loss, lack of coordination, fatigue, dizziness and loss of feeling in the extremities. **Exhibit 6,** deposition of Eric Prim, p. 23, l. 16-p. 24, 1.15.

Janet told Eric she was not doing well and needed to leave the concert and they did**. Exhibit 6,** deposition of Eric Prim, p. 31, l. 14-15. When they left they had to leave almost a full bottle of wine behind. **Exhibit 6,** deposition of Eric Prim, p. 32, l. 14-17.

Janet and Eric's three concert guests were not concerned when the Prims left the concert as they could walk home by themselves.  **Exhibit 6,** deposition of Eric Prim, p. 32, l. 22-24. Eric Prim knows when he is intoxicated. **Exhibit 6**, deposition of Eric Prim, p. 34, l. 14-16.

Eric Prim had cash in his wallet to pay anyone who could order an Uber for them and would have done so. **Exhibit 6,** deposition of Eric Prim, p. 35, l. 6. Eric Prim asked everyone if he could call his lawyer son Robert to pick him up. **Exhibit 6,** deposition of Eric Prim, p. 35, l. 16-18.

No one gave the Prims an opportunity to call anyone to pick them up prior to being arrested. **Exhibit 6,** deposition of Eric Prim, p. 35, l. 24-p. 36, l.1. No one gave the Prims an opportunity to contact their guests at the Pavilion to take them home. Exhibit 6, deposition of Eric Prim, p. 36, l. 25-p. 37, l.6.

Eric Prim is not aggressive when intoxicated. **Exhibit 6,** deposition of Eric Prim, p. 37, l.21-22. No one gave the Prims an opportunity to call anyone to pick them up prior to being arrested. **Exhibit 6,** deposition of Eric Prim, p. 35, l. 20-p. 36, l.1.

Eric remembers having 3 glasses of wine at the Grotto and no alcohol before that. **Exhibit 6,** deposition of Eric Prim, p. 39, l. 3-21.

The Prims arrived around 4 pm at the Grotto and had their first drinks of wine.  No one gave the Prims an opportunity to call anyone to pick them up prior to being arrested. **Exhibit 6,** deposition of Eric Prim, p. 40, l. 12-22.

Dinner at the Grotto started at 5 pm where the Prims had more wine and the others drank alcohol as well. **Exhibit 6,** deposition of Eric Prim, p. 41, l. 15-17.

Eric testifies no one is intoxicated at dinner. **Exhibit 6,** deposition of Eric Prim, p. 49, l. 11-15.

Eric testifies that Janet and he had two wines at the concert. **Exhibit 6,** deposition of Eric Prim, p. 55, l. 10-14.

Eric says he and Janet had 5 glasses of wine in 6 hours. **Exhibit 6,** deposition of Eric Prim, p. 55, l. 24 - p. 56, l. 1.[5]

---

[5] Note that further testimony reveals the Prims had 7 glasses of wine in 6 hours, however, this does not take them anywhere near intoxication as it was over the course of at least 6 hours. See **Exhibit 10.** Expert report of Lance Platt.

Mr. Prim states he and Janet were not intoxicated when they were stopped by Harshaw. **Exhibit 6,** deposition of Eric Prim, p. 56, l. 21-p. 57, l. 2. Mr. Prim thought it safe for Janet to walk home and they had done a similar walk safely 20-30 times. **Exhibit 6,** deposition of Eric Prim, p. 57, l. 12-p.58, l.3.

Defendants do not contend Janet Prim ever fell down and Eric agrees. Furthermore, Eric knew once out of the loud noise and flashing lights of the CWMP everything would be fine. **Exhibit 6**, deposition of Eric Prim, p. 58, l. 11-18.

Eric says it was not substantially safer to put Janet in a wheelchair and they were perfectly capable of walking home safely. **Exhibit 6,** deposition of Eric Prim, p. 59, l. 18-25.

Eric did not shove Harshaw nor make a movement which could be perceived that way. **Exhibit 6,** deposition of Eric Prim, p. 60, l. 1-13.

Harshaw grabbed Mr. Prim violently by the arm and jerked him away from Janet so he was not holding Janet any more. Then Harshaw forced Eric to the security office area all the while asking to call his son Eric so he could come pick them up but was ignored. **Exhibit 6,** deposition of Eric Prim, p. 60, l. 14-p.61, 1.13.

**<u>CWMP security supervisor Harshaw then instructed defendant MCSO Officer Webb, who was also working for the CWMP, to arrest the Prims and Webb said she would take care of it. Exhibit 6, deposition of Eric Prim, p. 63, l. 10-13.</u>**

No intoxication test was administered to Janet. **Exhibit 6,** deposition of Eric Prim, p. 64, l. 18-25. Eric has suffered great mental anguish due to the actions and inactions of Harshaw and the CWMP. **Exhibit 6,** deposition of Eric Prim, p. 66, l. 2-25.

Eric adds two more glasses of wine to the total of seven in six hours. **Exhibit 6,** deposition of Eric Prim, p. 75, l. 19-21; p.78, l. 7-11.

Janet cannot see her feet in the daytime or nighttime and Eric can safely guide her home using a flashlight through the short distance to the house. **Exhibit 6,** deposition of Eric Prim, p. 93, l. 6-p. 95, l. 23.

Once Eric got Janet out of the loud noise and flashing lights of the concert from experience Eric knew Janet would be better and he would reassess what to do.  **Exhibit 6,** deposition of Eric Prim, p. 98, l. 1. 17-25. Janet has never fallen on her walks to the grocery store (close to the CWMP) and back at night.  **Exhibit 6,** deposition of Eric Prim, p. 102, l. 7-25.

When Harshaw grabbed Eric's arm it hurt and when Eric reached up to remove the painful grip Harshaw was threatening. **Exhibit 6**, deposition of Eric Prim, p. 124, l. 11-19. Harshaw says the Prims need to arrested to defendant Deputy Stein. **Exhibit 6,** deposition of Eric Prim, p. 130, l. 19-p.132, l. 10.

Eric testifies as so requested injunctive relief of training and being given a breathlyzer to prove a person exhibiting signs of a disease can show they are not intoxicated and are not sent off to jail when they have not committed a crime. **Exhibit 6,** deposition of Eric Prim, p. 141, l. 7-p.143, l. 2.

Eric iterates that he requested to call his son to take them home, walk home or go back to his companions for a ride home to Harshaw. **Exhibit 6,** deposition of Eric Prim, p. 144, l. 15-17. When Eric called his son Robert from the jail he got through and his son came and got him**. Exhibit 6,** deposition of Eric Prim, p. 146, l. 8-p.147, l.24.

<u>VIDEO OF THE PRIMS IMMEDIATELY AFTER BEING DETAINED BY HARSHAW</u>

The CWMP video of the Prims right after their false imprisonment and assault by Harshaw at the CWMP security facility (**Exhibit 11**) and the video of their squad car ride to the Montgomery County jail illustrate that neither Eric or Janet are intoxicated.

Nowhere on either video at **Exhibits 11 and 12**[6] is Eric displaying any behavior that can be considered intoxication, he is not stumbling or unsteady (even as he is in handcuffs), nor does he slur his words or is there any inappropriate act for his situation. Janet Prim, meanwhile displays the symptoms of her MS for which she was arrested.

**--Video of Squad car ride to jail.**

Video starts suddenly (at 2:02) at around 11:39 pm shows the Prims in the back seat of a MCSO squad car being taken to jail. Eric is speaking and not slurring his words and his thought pattern as indicated by his choice of words is logical for the situation. **Exhibit 12.**

The MCSO driver deputy asks where the Prims live at and Eric responses logically without and slur. **Exhibit 11** at 3:25. Janet is weeping and the weeping continues throughout the ride to jail. **Exhibit 11** at around 3:45.

The MCSO deputy driver turns the back seat light on and Eric Prim, in handcuffs, is looking and acting sober. Eric is not slurring his words and his thought patterns, as indicated by his words, are logical and appropriate for the situation. **Exhibit 11** at 6:28. Throughout the video it is clear that Eric's eyes are not bloodshot. Eric's behavior throughout video is not indicative of a person so intoxicated to a be danger to himself or others (the standard for public intoxication arrest). It does not appear Eric is intoxicated at all.

**--Video of CWMP Security Room**

Throughout the video Eric Prim is not slurring his words, is not combative, is not unsteady or stumbling, and his words are appropriate for the situation. He shows no signs of intoxication. **Exhibit 11**, 5:42-.

---

[6] **Exhibits 11 and 12** are at Doc. 44 previously delivered to the court.

*Response to Montgomery County Defendants' Motion for Summary Judgment*                     19

The CWMP security room is used by the MCSO's deputies who work for the CWMP. **Exhibit 11** at 0:56 (MCSO Deputy working for CWMP in room).

Eric is brought into the CWMP security room by a MCSO deputy Stein working for CWMP as an employee. Eric is calm, steady and balanced (despite being handcuffed), and noncombative. **Exhibit 11** at 5:42. The clock on the wall reads 10:46 pm.

Janet is brought into the CWMP security room handcuffed by MCSO deputy Terrell working as a CWMP employee. **Exhibit 11** at 6:46. Janet is unsteady due to her MS.

MCSO deputy Webb working as an CWMP employee takes photos of the arrested handcuffed Prims on behalf of CWMP. **Exhibit 11** at 5:42. See photos produced by CWMP at **Exhibit 14.**

MCSO deputy Webb working as an CWMP employee fills out a report for the CWMP with the Prims. See **Exhibit 11** at about 13:00-20:00.

Eric speaks with no slurring and logically. **Exhibit 11,** 22:12, et seq.

Janet displaying signs of MS is led out in handcuffs at 11:16 pm. **Exhibit 11** at 34.17.

Eric steady on feet and displaying no signs of intoxication is led out of the CWMP security office at 11:26 pm. **Exhibit 11** at 44:50.

<u>DEPOSITION of RICHARD STEIN</u>

Richard Stein is a Montgomery County Sheriff's deputy who was employed (not a contractor) at the CWMP the night of the Prims' arrest. **Exhibit 2,** deposition of Richard Stein, p. 43, l. 5-6; p.105, l. 9- l. 18.

Deputy Stein is unaware of the symptoms of MS. **Exhibit 2,** Deposition of Stein, p. 36, l. 20-p.39, l. 2. Deputy Stein knows some MCSO deputies carry breathalyzers.   **Exhibit 2**, Deposition of Stein, p. 42, l. 22-25.

Deputy Stein is unsure if the CWMP gave him any ADA training. **Exhibit 2,** Deposition of Stein, p. 48, l. 9-l2.

Deputy Stein participated in the arrest of Janet Prim and Eric Prim.  **Exhibit 2,** Deposition of Stein, p. 68, l. 6-12. Deputy Stein admits the charges against the Prims were dismissed. **Exhibit 2,** Deposition of Stein, p. 60, l. 10-12.

Deputy Stein spoke to Harshaw who told Deputy Stein that Janet was stumbling and running into walls, was stopping frequently, and that _Eric told Harshaw Janet was blind_ but did not mention MS. **Exhibit 2,** Deposition of Stein, p. 73, l. 2-p. 75, l. 10. Harshaw also told Stein that Eric had glazed over eyes and slurring speech. Stein collected a lot of information from Harshaw to support the evidence in your Incident Report charge of public intoxication." **Exhibit 2,** Deposition of Stein, p. 76, l. 4-p.78, l.15.

Harshaw's input was important in the public intoxication investigation. **Exhibit 2,** Deposition of Stein, p. 79. l. 9-p. 80, l. 1.

Harshaw's deposition also goes on to state in the viewing of Exhibit 11 that Eric was stumbling or staggering. **Exhibit 11.**

<u>DEPOSITION of AUDREY TERRELL</u>

Deputy Terrell is a Montgomery County Sheriff's deputy and an employee of the CWMP. **Exhibit 3**, p. 10-13. Deputy Terrell has worked for the MCSO since 2005. **Exhibit 3**, p. 12, l. 5-10.

Deputy Terrell does not recall any ADA training, except for handicap ramps and hearing, throughout her schooling and law enforcement work history including at the MCSO up until the Prim arrest. **Exhibit 3**, p. 15, l.5-p. 16. l.25. Deputy Terrell knows nothing of any ADA policies at the MCSO. **Exhibit 3**, p. 17, l. 6-20.

Deputy Terrell admits that people with MS may stumble, it may affect their speech including slur words, may confuse people, and hinder answering simple questions. **Exhibit 3**, p. 26, l. 24 - p.27, l. 23. Deputy Terrell admits that drinking any amount of alcohol can cause a smell of alcohol on the breath and that does not mean intoxication. **Exhibit 3**, p. 28, l. 10.

Deputy Terrel admits she and Webb arrested of Janet Prim and the decision to arrest the Prims came from her, Webb and Stein only. **Exhibit 3**, p. 29, l. 24 -p 30, l. 2; p. 63, l. 8-p.64., l.3. Deputy Terrel was an employee of the CWMP the night the Prim's were arrested. **Exhibit 3**, p. 31, l. 17-p. 32., l. 12. The CWMP gave Terrell no ADA training before or after the Prims' arrests. **Exhibit 3**, p. 37, l. 18-24. Terrel is dressed as MCSO deputy when she works at the CWMP. **Exhibit 3**, p. 39, l. 1-4.

Deputy Terrell met with Janet Prim before Lt. Webb and does not remember telling Lt. Webb the Prims were intoxicated. **Exhibit 3**, p. 42, l. 18-p.43, l.5.

**Deputy Terrell testifies that Janet Prim was arrested "When we could not find someone to safely take her home."** **Exhibit 3**, p. 43, l. 22-24.

Prior to arrest Janet Prim told Deputy Terrel she had MS and Terrel had no reason to believe that she was not blind. **Exhibit 3**, p. 44, l. 15-p.45, l. 10.

Deputy Terrell does not recall speaking with Eric Prim. **Exhibit 3**, p. 47, l. 18-24. Deputy Terrell admits she is aware of the symptoms of MS. **Exhibit 3**, p. 48, l. 23-p.49, l. 6. Deputy Terrell received no information from CWMP medical director Tatom or any one at the CWMP, to support the Prims' arrest. **Exhibit 3**, p. 57, l. 6. Terrell testifies the only crime she suspected of the Prims was public intoxication. **Exhibit 3**, p. 57, l.19-p.58, l.1.

At the time of the Prims' arrest there was no suspicion of assault of Harshaw or anyone. **Exhibit 3**, p. 58, l. 6-7. There was no MCSO or CWMP policy that prevents deputies from taking Janet and Eric Prim home. **Exhibit 3**, p. 59, l. 17-20.

Deputy Terrell works traffic around the CWMP and has never witnessed a person run over and the sidewalks are lit. **Exhibit 3**, p. 61, l. 7-p.62, l.12.

Deputy Terrell admits that she does not know if all of Janet's symptoms of intoxication could be due to MS. **Exhibit 3**, p. 64, l.4-p.65, l.23.

Deputy Terrel admits that some MCSO deputies have breathalyzers in their vehicles and that there was one at the MCSO jail where Janet was taken and that the jail is where DWI suspects take breathalyzer tests. **Exhibit 3**, p.72, l.3 -p.73, l.17. Terrel admits a breathalyzer can help determine that someone is publicly intoxicated. **Exhibit 3**, p.76, l.18 – p.77, l. 8.

Deputy Terrel testifies there is no policy at the MSCO that allows for blood testing of individual who claims their MS is causing them to appear publicly intoxicated before arrest. However, there is policy for blood and breath tests when it comes to DWI. **Exhibit 3**, p.78, l.20 p.82, l.3.

When viewing the CWMP security room video Terrel does no see Eric Prim stumble of stagger. **Exhibit 3**, p.83, l.9-15. Terrell cannot tell that Eric Prim is slurring his words on the video. **Exhibit 3**, p. 85, l. 15-25. Deputy Terrell and Stein get the drivers' license from Eric Prim's wallet. **Exhibit 3**, p.89, l.7-p.90, l.9. Deputy Terrell cannot tell if Janet Prim is slurring her words. **Exhibit 3**, p.91, l.1-2. At the CWMP security Eric Prim gave Terrell his address without slurring his words. **Exhibit 3**, p.92,l.10-16. Lt. Webb took a photo of Janet on behalf of the CWMP as directed by the CWMP. **Exhibit 3**, p. 93, l.18-p.94, l.25. Lt. Webb took a photo of Eric Prim on behalf of the CWMP as directed by the CWMP. **Exhibit 3**, p. 96, l.4-16.

Terrell admits Eric Prim told Terrell Janet Prim was blind I the CWMP security office before being taken the Montgomery County jail. Exhibit 3, p. 100, l.4-11.

Terrell found out the ticket she wrote to Eric Prim was dismissed and she did not try and get it reestablished.   Lt. Webb took a photo of Janet on behalf of the CWMP as directed by the CWMP. **Exhibit 3**, p. 101, l.2-p.102, l.22.

The only observation that Terrel had that Eric Prim was intoxicated was that he mentioned the name of a Montgomery County law enforcement officer. **Exhibit 3**, p. 106, l.3-4.

Terrel realizes that probable cause must exist before an arrest and not after. **Exhibit 3**, p. 107, l.10-16.

## <u>DECLARATION OF THE PRIMS</u>

Eric Prim testifies that he did not assault Harshaw nor was he intoxicated:

3.      As we were leaving around 10:35 pm or so we were stopped by CWMP security supervisor Harshaw. Harshaw grabbed me painfully by the arm and drug me to the CWMP security office against my will and Janet's will. At the time we met Mr. Harshaw neither I nor Janet were intoxicated. My gate was steady and I was balanced and not stumbling. I did not slur my words and I was not aggressive towards Harshaw nor did I instigate any touching of Harshaw or assault him in any way. Neither Janet nor I were intoxicated.
**--Exhibit 9**, paragraphs 3 and 4.

4.      Janet and I each had about 6 average glasses of wine over a period of six hours. At no time was Janet or I a danger to ourselves or others during the night of June 18, 2017.

Janet Prim testifies she was not intoxicated and was suffering from a Multiple Sclerosis flare up.:

3.      As we were leaving around 10:35 pm or so we were stopped by CWMP security supervisor Harshaw. At the time we met Mr. Harshaw neither Eric nor I were intoxicated. At the time I was suffering from a flare-up of my MS symptoms.
4.      Eric and I each had about 6 average glasses of wine over a period of six hours. At no time was Eric or I a danger to ourselves or others during the night of June 18, 2017.
**--Exhibit 8**, paragraphs 3 and 4.

ADDITIONAL DEPOSITION TESTIMONY of FELICIA WEBB

Felicia Webb is a Montgomery County Sheriff's deputy who was employed at the CWMP the night of the Prims' arrest.

Webb states that the Montgomery County Sheriff's Department are the security for the CWMP. **Exhibit 4,** p. 133, l.25-p. 134, l. 4.

EXPERT REPORT OF LANCE PLATT

The expert report of Lance Platt Ph.D. clearly indicates that based upon the alcohol consumed by the Prims and other factors the Prims were not a danger to themselves or others and were not intoxicated. **Exhibit 10,** expert report and **Exhibit 15,** Platt resume. Platt read all the depositions in the case to arrive at the amount of alcohol consumed and even included an analysis if three additional drinks had been consumed by the Prims.

Platt's findings and opinions include (Exhibit 10):

(B)The Prims arrived at the Grotto at approximately 4:00 pm based upon the discovery I observed and evaluated.  Mr. and Mrs. Prim agreed that they consumed 2 glasses of wine before joining the rest of the dinner party at 5:14 pm.  The Prims consumed dinner during which they had consumed another two glasses of wine with dinner, which can slow the absorption of alcohol into the blood, was not addressed in any of the discovery I observed.  Mr. Prim stated that he purchased two bottles of wine at CMWP and he and Ms. Prim drank two more glasses. This would put the alcohol consumption by the Prims at 4 glasses, consumed before and during dinner and ½ of a bottle, which was stated to be two glasses for a total of six glasses of wine estimated at 4 ounces each. They arrived at CMWP after 7:23 pm, which is when their tab was closed at the Grotto.  Deputy Stein stated in his case report that he was called to the incident at 23:48:53 hours, which is 11:48 pm, 6 hours and 48 minutes after the first alcohol was consumed by the Prims.

(C) The National Highway Traffic Safety Administration (NHTSA) states that the consumption of alcohol with food slows the absorption of the alcohol into the blood. Accordingly, based on the elapsed time between alcohol consumption and the arrival of deputy Stein, coupled with the effects of food on the absorption of alcohol, in my professional opinion the BAC would not have reached the .08 threshold, my belief is that the level possibly would have been in the .02-.03 range for a 190 pound woman and a .0 to .01 range for a 210 pound man, it is my belief based on the depositions stating that the alcohol was consumed in increments of time with dinner, not all at once.  It is my belief based upon the Blood Alcohol Calculator that if Ms. Prim consumed three additional drinks, I believe her BAC would have been in the .05 to .06 ranges, if Mr. Prim had

consumed three additional drinks, I believe his BAC would have been in the .04 to .05 ranges. It should also be mentioned that food was not factored into the BAC calculator results thus the BAC ranges are at the top of the expected result without food and in my opinion with the confirmed food and times of consuming alcohol in increments the BAC would be lower for both Mr. and Mrs. Prim.

(F)Mr. Harshaw stated he knew how a person with MS will walk and talk although he admitted a lack of knowledge of the various types of MS and how they affect physical and mental faculties. MS in my opinion can effect a person much the same way alcohol does with balance, coordination, speech and vision issues and impairment, he also stated that he was not a doctor and he can't "diagnose". Mr. Harshaw does not deny he called in Mr. and Ms. Prim as being intoxicated to Deputy Stein who assumed the investigation with this information from Mr. Harshaw.

(G) Mr. and Ms. Prim were apparently not reported for any unusual behavior by anyone in the CMWP other than the usher and Mr. Harshaw. Mr. Harshaw apparently observed Mr. and Ms. Prim for 5 minutes before contacting them and requesting a wheelchair from a paramedic. No EMS or ambulance (outside entity) was called to the scene.

(K) Ms. Prim stated she was having an episode with her MS. Depositions taken of all involved and the information differs from one party to another as to what actually happened. It is my belief that when a family member is in distress, it is normal to "come to the rescue" of that family member especially when your wife suffers from a disease that she and her husband understand better than any non-medical 3rd party. Ms. Prim did state in her deposition that the only reason she has not fallen during an episode is because Mr. Prim kept her and stopped her from doing so. It is my opinion that no one knows more about her episodes and how to safely and effectively handle them than she and her husband.

(N) Regarding the odor of alcohol, in 1998, the Southern California Research Institute (SCRI) in cooperation with the Insurance Institute for Highway Safety conducted a study entitled "Police Officers detection of breath odors from alcohol ingestion" authored by Herbert Moskowitz, Marceline Burns, and Susan Ferguson. The end results of this research indicated, "it was demonstrated that officer's were able to derive only limited information from alcohol odor. These findings are consistent with the Widmark (1932) police station study and the Compton (1985) open-air roadside studies. Both previous studies found small likelihood of detecting breath alcohol odors for BAC's below 0.08 and 0.10% and detection failures even below 0.10%". As with the Widmark and the Compton studies on breath alcohol odor, the SCRI study also indicated that the officer's were unable to consistently classify odor of alcohol to intoxication levels. This was especially evident at 0.08% BAC's and lower.

(Q) Mr. Prim weights 210 pounds and Ms. Prim weighs 190 pounds, over the 6 hour and 48 minute period, allowing for absorption with food in the stomach, it is my opinion the estimated BAC of Mr. and Ms. Prim would be well below .08 and most likely in the .0 to .03 ranges. It is my belief based upon the Blood Alcohol Calculator that if Ms. Prim consumed three additional drinks, I believe her BAC would have been in the .05 to .06 ranges. With 3 additional drinks Mr. Prim would be in the 0.05 to .06.

*Response to Montgomery County Defendants' Motion for Summary Judgment*          26

(V) There were no sobriety, breath or blood tests administered either standardized or non-standardized to the Prims.

(W) It is my belief based on all discoveries that the incident involving the Prims was volatile from the beginning to the actual arrest. Ms. Prim did nothing to escalate any tensions. It is the duty of law enforcement and security guards to deescalate incidents, and in my opinion an arrest of both Mr. and Ms. Prim for public intoxication was not warranted based upon the known facts of alcohol consumption over time with the consumption of food and Ms. Prims MS, which I do not believe the investigation accommodated for or considered.

(X) I observed two submitted videos, one was what I believe to be the processing room, at CMWP. The video was 1 hour and 18 minutes long, at 51 seconds I observed an officer enter the room that I believe to me deputy Stein, along with several other officers.  During this time there is no slurring of words or other behavior, which is attributable to intoxication.  Since this video occurred almost immediately after the Prim's initial detention it is unlikely the Prim's would have "sobered up" in the brief interval from when stopped by Harshaw until they appear on the video.  Also, based upon my observation of the video, I observed the Deputy to enter the room and walk out of camera view, it is also my opinion that the deputy appeared to have difficulty with his gait as he walked, and I do not believe he is intoxicated.  The second video was the ride from CMWP to the jail facility in Montgomery, County, Texas.  The video lasted 16 minutes and 29 seconds, at 11:39:00 the Deputy turned the camera around and I observed two people, a male and a female in the back of the patrol car, I believe those people to be Mr. and Ms. Prim.  I observed Mr. Prim to be handcuffed and Ms. Prim not to be.  Both the Prims carry on what I believe to be a logical conversation with the officer, Ms. Prim does cry at times, I have observed many people both male and female cry in the presence of law enforcement and in my opinion this is normal, Mr. Prim in my opinion is still protecting his wife by speaking to her in a calm and reasonable tone of voice, which in my opinion shows he had control of his faculties. I did not observe any of the violent or combative behavior to be recreated in the patrol car.  Neither Mr. or Ms. Prim appeared to be violent nor uncooperative in any manner, I listened to clear and logical speech from all three people in the patrol car including the officer.

(Y) I have experience in law enforcement tactics, training, use of force and policies and procedures. I was employed by the city of College Station, Texas police department for 9 years.  I attained the rank of Master officer and also attained the State of Texas certification as a Master Peace Officer. I was also employed by the Texas A&M University System (TEEX) as a law enforcement trainer and program coordinator.  I taught police cadets and certified peace officers in the use of force and defensive tactics as well as developing curriculum on officer safety and tactics. I am also a National Highway Traffic Safety Administration (NHTSA) standardized field sobriety testing (SFST) practitioner, instructor and have been designated as a train the trainer by the NHTSA. I own Platt and Associates Consulting, located in Bryan, Texas.  I was also the state of Texas coordinator for the Drug Recognition Expert (DRE) program.  I have consulted on both criminal and civil cases in numerous states including Texas.  I have a Bachelor of Science, Master and Ph.D. degrees.  I was a licensed Texas Peace Officer for over 20 years and was honorably discharged by the State of Texas.

## CAUSES OF ACTION

### FALSE ARREST of ERIC and JANET PRIME

The Fourth Amendment guarantees everyone the right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." *U.S. Const. amend. IV.* Fourth Amendment violation are actionable under 42 U.S.C. Section 1983.

It is clear from the deposition testimony, video evidence, Platt report and declarations of Janet and Eric Prim cited herein that a fact issue remains that no reasonable officer would have arrested Eric and Janet for Prim for anything including public intoxication.

Defendant Montgomery County and individual defendant deputies violated Janet and Eric's Fourth Amendment and Fourteenth Amendments rights, at least, when they were searched and detained them without probable cause or reasonable suspicion and arrested and falsely prosecuted with malice without probable cause. The charges were dismissed and ended in their favor without any fine or other obligation.

Defendant County and Individual deputies arrested Janet and Eric without a warrant and without probable cause in violation of their clearly established rights.

Defendant County and Individual deputies had no objectively reasonable belief that the arrest was lawful. The facts and circumstances as described above would not lead a prudent person to believe that an offense had been committed. The totality of circumstances in this case, viewed from the standpoint of an objectively reasonable police officer, would not and did not amount to probable cause.

The charges against Janet and Eric were determined to lack merit and were quickly dropped.

## AMERICANS WITH DISABILITIES ACT

Montgomery County Sheriff Department violated Title II of the ADA.

Title II affirmatively requires that governmental agencies modify and accommodate their practices, policies, and procedures as necessary to avoid discriminating against individuals with disabilities.

Further, Montgomery County has been, and is, a recipient of federal funds. Thus, Montgomery County must comply with Section 504's mandate. Section 504 requires that federal money recipients reasonably accommodate persons with disabilities in their program activities and services and reasonably modify such services and programs to accomplish this purpose.

The County is a public entity and its law enforcement department qualifies as a program and service for purposes of Title II of the ADA and Section 504

The County violated Title H of the ADA and Section 504 by:

> a. Failing and refusing to reasonably modify and accommodate sheriff department operations and services for Janet Prim, which would include avoiding arresting people for displaying symptoms of multiple sclerosis and educating and training officers in the care of disabled persons. The County and its sheriff department made none of these modifications and accommodations;

> b. Failing and refusing to adopt a policy to protect the well-being of people like Janet, persons with disabilities such as multiple sclerosis;

> c. Discriminating against Janet, as a sufferer of multiple sclerosis, in the provision of services by the County's sheriff department, on the basis of her disability, by not accommodating her needs related to her disability; and,

d. Failing to conduct a self-evaluation plan under the ADA and Section 504, and then failing to modify its programs and services to accommodate the needs of persons with mental disabilities, such as Janet, when called upon to provide service.

Plaintiffs seek damages, as well as declaratory and injunctive relief, under the ADA and Section 504.

Janet Prim had a disability, MS, as well as blindness and suffered from a stroke. Due to her MS symptoms such as stumbling, confusion, unsteady gait, and moving slowly Lieutenant Webb and Deputy Stein arrested the Prims and would not let Janet leave with her caregiver-Eric Prim-to take her home despite Eric have plenty of cash to foot any transport charge and with home being mere blocks away (supra). Lieutenant Webb was aware of Janet's disability prior to interacting with her in the security office, stating "I knew that she was handicapped." Exhibit 4, Deposition of Webb, p. 69, l. 16-17. Janet and Eric told Stein, Webb and Terrell repetively Janet suffers from MS.

**PATTERN AND PRACTICE OF WRONGFUL ARREST**

Defendant County did not have adequate written policies, or train or supervise the deputies properly such that they arrested Janet without any probable cause because she suffered from MS. Lieutenant Webb, being the senior ranking deputy present, acted in a supervisory capacity in allowing and participating in the false arrest of Janet and Eric.

Defendant County clearly condoned and ratified the actions of the Defendant Deputies by allowing the arrest and subsequent detention to take place despite having full knowledge of the facts and circumstances surrounding the situation. The deliberately indifferent training and

supervision was a direct and proximate cause of the deprivation of Janet and Eric's federally protected rights. As such, the execution of official policy caused the constitutional violations.

Defendant County determined that there was no violation of policy in the interaction with Janet and Eric thereby ratifying the deputies' Unconstitutional behavior.

Defendant County already has established a pattern and practice of arresting people without probable cause.

## SUMMARY JUDGMENT STANDARDS

FRCP 56 dictates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing of the existence of an element essential to the party's case, and on which that party will bear the burden at trial. *Baton Rouge Oil and Chem. Workers Union v. ExxonMobil Corp.,* 289 F.3d 373, 375 (5th Cir. 2002) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).   When deciding a motion for summary judgment, the Court must determine whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." **FED. R. CIV. P. 56(c)**; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Calbillo v. Cavender Oldsmobile, Inc.*, 288 F.3d 721, 725 (5th Cir. 2002).   An issue is material if its resolution could affect the outcome of the action.  *Terrebonne Parish Sch. Bd. v. Columbia Gulf Transmission Co.,* 290 F.3d 303, 310 (5th Cir. 2002) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

Whether a fact issue has been created, a court must draw from the facts and the inferences to be drawn from them in a light most favorable to the nonmoving party.  *Hotard v. State Farm Fire & Cas. Co.,* 286 F.3d 814, 817 (5th Cir. 2002).   If the nonmovant presents a factual

controversy by asserting facts at odds with the movant then at the summary judgment stage the issue is resolved in favor of the nonmovant. *Olabisiomotosho v. City of Houston,* 185 F.3d 521, 525 (5th Cir. 1999).

The movant for summary judgment has the initial burden of demonstrating the absence of a material fact issue regarding the issues on which the movant bears the burden of proof at trial. *Smith v. Brenoettsy*, 158 F.3d 908, 911 (5th Cir. 1998). The movant meets this initial burden by showing that the "evidence in the record would not permit the nonmovant to carry its burden of proof at trial." *Id.* If the movant meets this burden, the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial. *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 282 (5th Cir. 2001) (quoting *Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1998)). A material fact dispute is genuine when the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* (quoting *Smith v. Brenoettsky*, 158 F.3d 908, 911 (5th Cir. 1998)); *Quorum Health Resources, L.L.C. v. Maverick County Hosp. District*, 308 F.3d 451, 458 (5th Cir. 2002).

"The nonmoving party must present specific facts which show "the existence of a 'genuine' issue concerning every essential component of its case." *Id.* In the absence of any proof, the court will not assume that the nonmovant could or would prove the necessary facts. *McCallum Highlands, Ltd. v. Washington Capital Dus, Inc.*, 66 F.3d 89, 92 (5th Cir. 1995), *revised on other grounds upon denial of reh'g*, 70 F.3d 26 (5th Cir. 1995); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

## CONCLUSION & PRAYER

The Montgomery County defendants have not met their initial burden of demonstrating the absence of a material fact issue regarding the issues on which the defendants bear the burden of proof at trial.

Material fact issues remain, necessitating a jury trial, as to whether:

Webb, Terrell and Stein lacked probable cause to arrest and prosecute Eric and Janet Prim;

Janet Prim was arrested because of symptoms of her multiple sclerosis and Montgomery County failed to accommodate Janet Prim under the ADA; and

Montgomery County ratified the behavior of the deputies when it determined that the deputies' arrest of the Prims was consistent with departmental policy.

WHEREFORE, Plaintiffs request that the Montgomery County defendants' motion for summary judgment be DENIED and requests all other relief in Law and/or Equity that plaintiffs shows themselves entitled.

Respectfully Submitted,
Kallinen Law PLLC

/s/ Randall L. Kallinen
Randall L. Kallinen
State Bar of Texas No. 00790995
U.S. Southern District of Texas Bar No.: 19417
511 Broadway Street
Houston, Texas 77012
Telephone: 713.320.3785
FAX: 713.893.6737
E-mail: AttorneyKallinen@aol.com
Attorney for Plaintiff

## CERTIFICATE OF SERVICE

I certify that I have served upon all opposing counsel and all pro se parties a true and correct copy of the foregoing on this the 6th day of September 2019.

/s/ Randall L. Kallinen

Randall L. Kallinen